AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>ONE APPLE IPHONE XR CURRENTLY<br>LOCATED IN WASHINGTON, D.C., UNDER<br>RULE 41 | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 26-SW-196 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 924(c) (Possession of a Firearm During and in Relation to a Drug Trafficking Crime); 21 U.S.C. § 841 (Possession of a Controlled Substance with Intent to Distribute); 22 D.C. Code § 2801 (Robbery). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brandon Twentymon, Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:  _____6/16/2026_____

_____
*Judge's signature*

City and state:  _____Washington, D.C._____

Matthew J. Sharbaugh
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* ONE APPLE IPHONE XR CURRENTLY LOCATED IN WASHINGTON, D.C., UNDER RULE 41 | ) ) ) ) ) ) ) | Case No.  26-SW-196 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 30, 2026 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Matthew J. Sharbaugh _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 6/16/2026 _____

City and state:      Washington, D.C.

_____
*Judge's signature*

Matthew J. Sharbaugh
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>26-SW-196 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
| <br>        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br><br>Date:  _____<br><br><br>                                                   _____<br>                                                             *Executing officer's signature*<br><br><br>                                                   _____<br>                                                                *Printed name and title* |

## ATTACHMENT A

*Property to be searched*

The property to be searched is a previously completed extraction (the "TARGET EXTRACTION") from a gray Apple iPhone XR (the "TARGET DEVICE"), which was seized during the arrest of Darryl GOLDSTON on March 2, 2026, in Washington, D.C.  The TARGET EXTRACTION is currently stored at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), located at 90 K Street NE, Washington, D.C.

1

## **ATTACHMENT B**
*Property to be seized*

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 924(c) (Possession of a Firearm During and in Relation to a Drug Trafficking Crime), 21 U.S.C. § 841 (Possession of a Controlled Substance with Intent to Distribute), and 22 D.C. Code § 2801 (Robbery) (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to, call logs, phone books, voicemail messages, text messages, photographs, images and videos, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect the following:

a. Establishes or documents the commission of the TARGET OFFENSES;

b. Identifies locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and traveled to in preparation for the TARGET OFFENSES;

c. Reflects the ownership and use of the TARGET DEVICE by the individual committing the TARGET OFFENSES;

d. Documents meetings and communications between individuals committing one or more of the TARGET OFFENSES;

e. Contains evidence of communications between GOLDSTON and other individuals who may have assisted or provided support (knowingly or unknowingly) in the commission of one or more of the TARGET OFFENSES, including information that helps reveal their identities or whereabouts;

f. Relates to the victims, locations, participants, and proceeds associated with the TARGET OFFENSES;

e. Contains evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about

2

matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

f. Reflects communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g. Contains photographs or videos that would constitute evidence of a violation of the TARGET OFFENSES, including images or videos appearing to depict the possession, use, or distribution of a firearm, firearm accessory, or ammunition;

h. Documents or contains evidence of the obtaining, secreting, transfer, expenditure, or concealment of firearms, ammunition, or controlled substances in violation of the TARGET OFFENSES;

i. Consists of records and information relating to firearm or ammunition purchases, suppliers, or ownership; installation of firearm accessories; controlled substances, purchases of controlled substances, or suppliers of controlled substances; or the criminal history of the individual who committed the TARGET OFFENSES;

j. Contains evidence concerning sourcing of any ammunition illegally possessed, and items associated with the ownership of firearms such as magazines, bulletproof vests, gun cleaning kits, gun-sights, holsters, and records, documents, electronic evidence, and other evidence of the purchase, possession or ownership of such weapons, ammunition, and associated items;

k. Consists of records of the email addresses, phone numbers, social media, or account identifiers used by the perpetrators of the TARGET OFFENSES as well as any aiders and abettors, coconspirators, and accessories after the fact;

l. Establishes or documents the subject's access to, purchase of, possession of, or relationship with, firearms or narcotics;

3

m.  Relates to the state of mind of the suspect, e.g., intent, absence of mistake, or evidence indicating preparation, planning, knowledge, or experience, related to the TARGET OFFENSES;

n.  Contains evidence of who used, owned, or controlled the TARGET DEVICE at the time the things this warrant describes were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

o.  Contains evidence of software, or the lack thereof, that would allow others to control the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

p.  Contains evidence of the attachment to the TARGET DEVICE of storage devices or similar containers for electronic evidence;

q.  Contains evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

r.  Contains evidence of the times the TARGET DEVICE was used;

s.  Contains passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE;

t.  Contains documentation or manuals that may be necessary to access or conduct a forensic examination of the TARGET DEVICE;

u.  Consists of records of or information about Internet Protocol addresses used by the TARGET DEVICE;

v.  Consists of records of or information about the TARGET DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or

4

"favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

g.  Contains evidence of identification documents or documents containing the personal identifying information of persons other than GOLDSTON, such as dates of birth, social security numbers, financial records, or employment records of other persons.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE APPLE IPHONE XR CURRENTLY LOCATED IN WASHINGTON, D.C., UNDER RULE 41** | **SW No. 26-SW-196** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Brandon Twentymon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search a previously completed extraction (the "TARGET EXTRACTION") of a digital device, namely, a gray Apple iPhone XR (the "TARGET DEVICE"), as described in Attachment A, that is currently in the possession of the Bureau of Alcohol, Tobacco, Firearms and Explosives, located at 90 K Street Northeast, Washington, D.C. The requested warrant would authorize an examination of the TARGET DEVICE for the information described in Attachment B.

2.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2510(7) of Title 18, United States Code. As a federal law enforcement officer, I am authorized to investigate violations of laws of the United States, including the crimes outlined herein, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.      I am a federal Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and Assistant Task Force Commander of the Strategic Task Force Interdicting Narcotics and Guns Initiative ("STING Task Force").  I have served as a law

6

enforcement officer with the Metro Transit Police Department ("MTPD") for over twenty-one years and hold the supervisory rank of Senior Police Detective. Before my assignment to ATF, I served in the MTPD's Criminal Investigation Division for eighteen years where I personally investigated and supervised the investigation of serious criminal offenses, including crimes related to homicide, attempted homicide, armed robbery, unlawful possession, carrying, and trafficking of firearms, and offenses related to possession, distribution, and trafficking of narcotics.

4.      I have received basic and advanced training in general law enforcement, investigations, criminal law, and the laws governing arrest and search and seizure. In addition to federal authority, I am sworn and authorized with tri-state police jurisdiction, permitting me to enforce criminal law, make arrests, execute search and seizure warrants, and investigate crimes in the State of Maryland, the District of Columbia, and the Commonwealth of Virginia.

5.      As an ATF TFO, I have experience and am responsible for investigating violations of federal firearms, drug laws, and violent criminal activity. In the course of my training and experience, I have become familiar with the methods and techniques associated with the possession and distribution of firearms, drugs, violent crime such as robbery, and the organization of firearms and drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants/cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, conducting court-authorized wire and oral interception electronic surveillance, and preparing and executing search/arrest warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

7

6.      Based on your Affiant's training, knowledge, and experience, individuals engaged in criminal activity – including robbery and drug trafficking – frequently utilize cellular telephones and other digital devices as primary tools to facilitate, coordinate, and conceal their criminal activities. Such individuals often employ multiple telephones, utilize fictitious subscriber information or accounts in the names of associates or family members, and engage in counter-surveillance techniques and coded communications to avoid detection by law enforcement. It is common for these individuals to use multiple communication methods in tandem, including voice calls, text messages, video calls, audio messages, and application-based messaging platforms, rather than relying on a single mode of communication. For example, parties routinely identify the target of a robbery and coordinate the facilitation of the robbery through calls and messages to organize a plan, confirm the plan, and execute the crime. These communications frequently include discussions regarding the relationship of the victim to the perpetrators, the items that are to be taken, meeting locations, and logistics, as well as the exchange of photographs or videos depicting the items stolen or the sale of the items stolen.  In addition, parties will facilitate the acquisition and sale of drugs frequently through calls and messages, which routinely include negotiating a price, the price of the drugs for sale, and coordination of a place to meet for the sale.

7.      Your Affiant further knows, based on training and experience, that individuals who unlawfully sell controlled substances and facilitate robberies commonly use cellular devices to communicate with co-conspirators before, during, and after the offense. These communications may include coordinating movements, sharing real-time location information, documenting the offense, and maintaining ongoing contact with associates involved in the criminal activity. Additionally, such individuals often retain evidence of their conduct on their devices, including call logs, contact lists, text and multimedia messages, social media communications, internet

8

search history, location data, and digital media. This information can demonstrate possession of the drugs for sale, participation in sale, photographs of the drugs for sale and of the items taken during the robbery, and association with other involved individuals. Based on that as well as the information located in the TARGET EXTRACTION as discussed below, there is probable cause to believe that evidence of violations of controlled substance and drug laws, robbery, and related offenses will be found on the TARGET DEVICE.

8.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.

9.      Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for the TARGET EXTRACTION from the TARGET DEVICE recovered from GOLDSTON, I have not set forth every fact learned during this investigation. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief.

10.     On the basis of this familiarity, and on the basis of other information your Affiant has reviewed and determine to be reliable, I allege the facts to show there is probable cause to believe that evidence of violations of: 18 U.S.C. § 924(c) (Possession of a Firearm During and in Relation to a Drug Trafficking Crime), 21 U.S.C. § 841 (Possession of a Controlled Substance with Intent to Distribute), and 22 D.C. Code § 2801 (Robbery) (collectively, the "TARGET

9

OFFENSES"), will be found in the TARGET EXTRACTION of the TARGET DEVICE, which is a mobile device recovered from DARRYL GOLDSTON.

**<u>PROBABLE CAUSE</u>**

*Forensic Extraction of TARGET DEVICE*

11. On March 31, 2026, United States Magistrate Judge Moxila A. Upadhyaya in the United States District Court for the District of Columbia issued Search Warrant No. 26-SW-106 authorizing the search of a cellular telephone seized from Darryl GOLDSTON (hereinafter "GOLDSTON") for evidence related to violations of federal firearms laws and a shooting that occurred on February 24, 2026, in Washington, D.C., in which GOLDSTON is believed to have been involved (the "Original Warrant"). Pursuant to the Original Warrant, law enforcement personnel conducted a forensic extraction of the contents of GOLDSTON's cellular telephone (the "TARGET DEVICE") using industry-standard digital forensic tools and methodologies. A forensic image and extraction of the data contained on the TARGET DEVICE was created and preserved in a manner designed to maintain the integrity of the original data, prevent alteration or modification, and permit subsequent forensic examination and verification. The extracted data remains in law enforcement custody and is available for additional review and analysis.

*Discovery of Evidence Outside Original Scope*

12. During the execution of the Original Warrant, your Affiant observed communications and data within the TARGET EXTRACTION, based on your Affiant's training and experience, that are indicative of criminal activity unrelated to the firearms offenses specified in the Original Warrant.

13. Specifically, investigators identified, in plain view, communications and digital evidence suggesting GOLDSTON's involvement in (1) the distribution of controlled substances,

10

including but not limited to narcotics trafficking, including communications for narcotics distribution, pricing, quantities, and coordination of transactions; and (2) robberies of individuals and commercial establishments, including discussions of targets, planning, and proceeds.

14.    Based on your Affiant's training and experience, individuals engaged in narcotics trafficking and robbery offenses commonly utilize cellular telephones to communicate with co-conspirators, coordinate criminal activity, track proceeds, and document illegal conduct.

### Segregation and Quarantine of Data

15.    Recognizing that the above-described information fell outside of the scope of the Original Warrant, your Affiant ceased further review of such data for investigative purposes related to those offenses. The identified data and communications were segregated and effectively "quarantined" from further review pending judicial authorization.

16.    Law enforcement has maintained the integrity of the extracted data and has limited review strictly to information authorized under the Original Warrant, except for the initial plain-view observations described above.

### Probable Cause for a Second Search Warrant

17.    Based on the foregoing, there is probable cause to believe that the TARGET DEVICE contains evidence, fruits, and instrumentalities of violations of federal and local law, including but not limited to Possession of a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c), Distribution of Controlled Substances, in violation of 21 U.S.C. § 841, and Robbery, in violation of D.C. Code § 22-2801.

18.    There is further probable cause to believe that the previously extracted data from the TARGET EXTRACTION as outlined in Attachment B contains evidence of these offenses.

11

*Evidence of Distribution of Controlled Substances*

19.     Throughout 2025 and early 2026, GOLDSTON engaged in communications with multiple associates regarding the acquisition, sale, and transfer of firearms, ammunition, and controlled substances, including marijuana and marijuana concentrates. These communications included discussions regarding the purchase of firearms from third parties, efforts to source ammunition, negotiations concerning the sale and transfer of firearms, and the transmission of photographs depicting firearms and loaded magazines consistent with the Beretta handgun recovered from GOLDSTON's person at the time of his arrest.[1]

20.     Additionally, investigators identified communications demonstrating GOLDSTON's involvement in the distribution of controlled substances. In multiple message threads, GOLDSTON discussed the sale of marijuana and marijuana-related products, coordinated transactions with associates, and referenced quantities and pricing consistent with street-level narcotics trafficking. These communications occurred over an extended period and involved multiple contacts, indicating ongoing participation in narcotics distribution activity.

*Evidence of Robberies in Washington, D.C.*

21.     The device also contained communications, photographs, videos, and location-related information indicative of robbery planning and execution. In several conversations, GOLDSTON and associates discussed identifying potential robbery victims, surveilling businesses, evaluating security measures, and targeting individuals believed to be in possession of

---

[1] The Court issued a search warrant for the TARGET DEVICE on March 31, 2026, with 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), D.C. Code § 22-4503.01 (Unlawful Discharge of a Firearm), D.C. Code § 22-402 (Assault with a Dangerous Weapon), and D.C. Code § 22-4504(b) (Possession of a Firearm During the Commission of a Crime of Violence) as the listed target offenses.

narcotics, firearms, or other valuables. Investigators identified videos and photographs depicting businesses and locations within Washington, DC, that were being surveilled or "cased" in advance of contemplated robberies, including a marijuana dispensary located at 416 H Street NE, Washington, DC, and other commercial establishments. In other communications, GOLDSTON provided associates with real-time descriptions and location updates regarding intended targets and coordinated meetings before and after suspected robbery events. Based on my training and experience, these communications are consistent with the planning, facilitation, and execution of robberies and other violent criminal activity.

22.     Further, the device contained communications referencing ammunition using coded terminology, including references to "eggs" and "shells," terms commonly used to describe ammunition. These communications were accompanied by photographs depicting ammunition consistent with ammunition recovered during this investigation. Collectively, the communications, photographs, videos, and other data recovered from the device demonstrate that GOLDSTON utilized the device to communicate with associates, coordinate criminal activity, identify targets, facilitate narcotics trafficking, acquire and transfer firearms and ammunition, and plan and execute robbery-related offenses.

### THE TARGET EXTRACTION

23.     The TARGET EXTRACTION is currently in lawful possession and is stored by the ATF at 90 K Street NE, Washington, D.C.

24.     The TARGET DEVICE was recovered from GOLDSTON's person during a search incident to his arrest on March 2, 2026.

25.     The TARGET EXTRACTION was downloaded from the TARGET DEVICE on April 15, 2026, and is currently in lawful possession of the ATF stored at 90 K Street NE, Washington, D.C.

26.     Based on my training and experience, I know that people who commit crimes in Washington, D.C. often use their cellphones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. This may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity. Furthermore, call logs, text messages, emails, and any applications enabling communications with others often include communications that shed light on the cellphone user's location and activity during a particular time period. Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from November 13, 2024, The Pew Research Center for Internet & Technology estimated that 98% of Americans owned at least one cellular phone, and that same 2024 report estimated that 91% of Americans owed at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited March 12, 2025).

27.     Based on my training and experience, individuals involved in the unlawful distribution of controlled substances frequently use cellular telephones and other electronic devices to facilitate their criminal activity. Such individuals commonly photograph narcotics available for sale and transmit those photographs to prospective customers through text messages, social media platforms, encrypted messaging applications, and other electronic means. They also retain photographs and videos depicting controlled substances, proceeds, packaging materials, and other evidence of narcotics trafficking on their devices. These images and videos often constitute valuable evidence of drug distribution offenses.

14

28.     In this investigation, the controlled substances associated with GOLDSTON's activities consist primarily of marijuana and psilocybin mushrooms. Although these substances may be marketed and distributed through various means, their possession, distribution, and sale remain unlawful under federal law and, under the circumstances of this investigation, constitute unlawful conduct under applicable local law as well. Based on my training and experience, individuals engaged in the unlawful distribution of marijuana, psilocybin mushrooms, and other controlled substances commonly use cellular telephones to communicate with suppliers, customers, and associates regarding the acquisition, pricing, availability, and distribution of those substances.

29.     Accordingly, I believe the TARGET DEVICE is likely to contain communications, photographs, videos, contact information, transaction records, and other electronically stored information relating to the acquisition, possession, distribution, and sale of controlled substances. Such evidence may include photographs of controlled substances offered for sale, communications arranging narcotics transactions, discussions regarding pricing and quantities, and communications identifying sources of supply and customers.

30.     Based on my training and experience, individuals involved in robberies and other theft-related offenses frequently use cellular telephones and other electronic devices to plan, coordinate, facilitate, and document their criminal activity. Such individuals commonly communicate with co-conspirators regarding potential targets, conduct surveillance of intended victims and locations, exchange photographs and videos of targets and their surroundings, discuss security measures and vulnerabilities, and share real-time location information before, during, and after the commission of a robbery. Cellular telephones are also frequently used to coordinate meetings, divide proceeds, identify individuals believed to possess narcotics, firearms, currency,

15

or other valuables, and communicate regarding the acquisition or use of firearms employed during the offense.

31.    In this investigation, a review of data extracted from the TARGET DEVICE revealed communications, photographs, videos, and location-related information consistent with the planning and facilitation of robbery activity. These materials include discussions regarding potential robbery targets, the surveillance and "casing" of businesses and individuals, the exchange of real-time information concerning the whereabouts and appearance of intended victims, and communications indicative of coordination between multiple participants before and after suspected robbery events. The extracted data further reflects communications concerning individuals believed to possess narcotics and firearms, as well as discussions regarding the disposition and division of proceeds following criminal activity.

32.    Based on my training and experience, individuals engaged in robbery-related offenses commonly retain evidence of their criminal activity on their cellular telephones, including communications with co-conspirators, photographs and videos of intended targets, mapping and navigation data, location information, call logs, contact information, internet searches, financial transaction records, and other electronically stored information. Accordingly, I believe the TARGET DEVICE is likely to contain additional evidence, fruits, and instrumentalities relating to robbery offenses, attempted robberies, conspiracy offenses, and other related violations of law.

33.    Your Affiant knows that it is common for individuals that know each other to often communicate via text message, phone calls, or other wireless communication through a cell phone. Your Affiant also knows that after suspects of crime leave the scene of the crime, they usually discuss or debrief aspects of the crime via voice calls, text messages, and application-based messaging platforms to plan and execute unlawful acts.  Consistent with the foregoing, your

16

Affiant reviewed communications extracted from the TARGET DEVICE that indicate GOLDSTON actively participated in the planning and facilitation of at least one robbery. Specifically, the communications reflect that GOLDSTON identified an intended robbery target, believed to have been located in Washington, D.C., summoned one or more associates to the location, provided those associates with a physical description of the intended victim, and relayed real-time updates regarding the victim's location and movements. The communications further indicate that GOLDSTON maintained surveillance of the intended victim while one or more co-conspirators approached and carried out the robbery. Following the robbery, additional communications indicate that GOLDSTON and at least one co-conspirator coordinated a meeting, during which they appear to have exchanged or divided proceeds obtained during the offense. Based on my training and experience, these communications are consistent with the planning, execution, and post-offense coordination commonly associated with robbery conspiracies and related violent criminal activity.

34. In summary, the execution of a search warrant on the TARGET EXTRACTION would likely enable law enforcement to, among other things: (i) identify communications relating to the acquisition, possession, distribution, and sale of controlled substances, as well as communications evidencing narcotics trafficking relationships between suppliers, distributors, customers, and associates; (ii) identify contact information for potential sources of supply, customers, co-conspirators, and other individuals involved in narcotics trafficking; (iii) identify meeting locations utilized for the negotiation, distribution, purchase, sale, or delivery of controlled substances; (iv) identify photographs and videos depicting controlled substances and indicia of narcotics trafficking, including packaging materials, scales, currency, price lists, customer communications, distribution quantities, and other evidence of drug distribution activity; (v)

identify communications relating to the coordination, planning, and execution of robberies occurring in Washington, D.C.; (vi) identify photographs, videos, and other evidence relating to property obtained during the commission of robberies; and (vii) identify evidence relating to the victims, locations, participants, and proceeds associated with such robberies. Additionally, evidence from the TARGET EXTRACTION may yield ownership information, as well as evidence connecting (or not connecting) GOLDSTON to the seized contraband. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES by GOLDSTON.

## **TECHNICAL TERMS**

35. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. "Digital device," as used herein, includes the following three terms and their respective definitions:

1. A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2. "Digital storage media," as used herein, means any information

18

storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to

19

and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications, which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.    A "GPS" navigation device, including certain wireless phones and tablets, uses GPS to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.

A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer or wireless telephone connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its

destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.   ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.   Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.   By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

22

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to

23

Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

o.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

p.      Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

q.      "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated

24

connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

r.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

s.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

36.    Based on my training, experience, and research, I know that the TARGET EXTRACTION, the TARGET DEVICE, and iPhones in general, have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device.

25

In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

37.    As described above and in Attachment B, this application seeks permission to search the TARGET EXTRACTION for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET EXTRACTION, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the TARGET EXTRACTION for at least the following reasons:

a.    Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity. Furthermore, I know from my training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.

b.    Your Affiant knows that people who distribute controlled substances like to take pictures of the controlled substances they sell to prove ownership or possession of a

26

particular drug to their friends. They will use a camera, cell phone with a camera, tablets with a camera, and/or personal computers to photograph, and store photographs of controlled substances or themselves holding controlled substances and other criminal activity that they may be involved in. These pictures or videos are excellent evidence of illegal narcotics possession. Moreover, cell phones can contain communications relating to the acquisition of controlled substances by those who cannot possess controlled substances legally, including the transmission of photographs of controlled substances for purchase, with accompanying price information. I know that people who possess controlled substances, unlawfully obtained money, and other contraband in the Washington, D.C. metropolitan area, often use their cell phones to capture and store images or video recordings of such contraband – sometimes called "trophy photos."

c.      Your Affiant knows, based on training and experience, that individuals involved in robberies and other theft-related offenses frequently use cellular telephones and other electronic devices to document, coordinate, and memorialize their criminal activity. Such individuals often use cameras, cellular telephones, tablets, and computers to photograph or record intended targets, locations, stolen property, proceeds, firearms, co-conspirators, and other evidence associated with robberies and related offenses. These photographs and videos may depict the planning stages of a robbery, surveillance of intended victims or locations, the proceeds obtained from a robbery, or the participants involved in the offense. Such images and recordings frequently constitute valuable evidence of criminal conduct.

d.      Moreover, cellular telephones commonly contain communications relating to the identification of robbery targets, the coordination of co-conspirators, the surveillance

27

of intended victims, the acquisition or use of firearms and other instrumentalities of the offense, and the division or disposition of proceeds following the commission of a robbery. Based on my training and experience, individuals involved in robberies often exchange photographs, videos, location information, and real-time updates concerning intended victims and target locations before, during, and after the offense. I also know that individuals who commit robberies frequently use their cellular telephones to capture and retain images or videos of stolen property, currency, firearms, luxury items, narcotics, and other proceeds obtained through criminal activity, sometimes as "trophy photos" intended to document or display the fruits of their crimes.

e.    Cell phones used by possessors of illegal controlled substances contain valuable information and evidence relating to their possession of narcotics. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. Such information can allow law enforcement to, among other things: (i) identify communications relating to the acquisition, possession, distribution, and sale of controlled substances, as well as communications evidencing narcotics trafficking relationships between suppliers, distributors, customers, and associates; (ii) identify contact information for potential sources of supply, customers, co-conspirators, and other individuals involved in narcotics trafficking; (iii) identify meeting locations utilized for the negotiation, distribution, purchase, sale, or delivery of controlled substances; (iv) identify photographs and videos depicting controlled substances and indicia of narcotics trafficking, including packaging materials, scales, currency, price lists, customer communications, distribution quantities, and other evidence of drug distribution activity;

28

(v) identify communications relating to the coordination, planning, and execution of robberies occurring in Washington, D.C.; (vi) identify photographs, videos, and other evidence relating to property obtained during the commission of robberies; and (vii) identify evidence relating to the victims, locations, participants, and proceeds associated with such robberies.

f.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

g.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The

29

browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

38.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET EXTRACTION at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the devices, not

30

currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

31

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

39.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.

32

Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device

33

is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and it can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smartphones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain

34

procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smartphones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running iOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smartphones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES 256 encryption for all data stored within the database in the mobile device.

f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide

35

array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your Affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

40.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     Law enforcement personnel have previously obtained a forensic extraction and/or forensic image of the TARGET DEVICE. Pursuant to Rule 41(e)(2)(B), law enforcement personnel, including technical experts assisting in the examination, are authorized to review, analyze, and search the previously acquired forensic data, including any forensic images, extraction files, and derivative data, for the purpose of locating and seizing the information described in Attachment B. The review may occur at a law enforcement laboratory or other appropriate location and may require the use of specialized forensic software and techniques to identify, recover, decrypt, organize, and analyze electronically stored information within the scope of this warrant.

b.     The analysis of the contents of the digital device may entail any or all of the various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains

36

and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to determine whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

41. Because the device is in the custody of the ATF and forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

42. Based upon the above-referenced facts, your Affiant submits that there is probable cause to believe that evidence of the TARGET OFFENSES will be located in the TARGET

37

EXTRACTION recovered from GOLDSTON.

43.    Based on the foregoing, I request that the Court issue the proposed search warrant,

pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,



Det. Brandon Twentymon
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent
with Fed. R. Crim. P. 4.1 and 41(d)(3) on June 16, 2026.

HONORABLE MATTHEW J. SHARBAUGH
UNITED STATES MAGISTRATE JUDGE

38